## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MICHAEL ALLENDER,

        Plaintiff,

v.                              No. CIV-O4-0935 BB/RLP

FREDDIE JOHN SCOTT, ISAAC F. PADILLA,
W. FRANK EMERSON, ARTURO CANDELARIA,
BENNIE COHOE, BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF CIBOLA, THE STATE OF NEW MEXICO,
CORNELIUS THOMAS, VAL R. PANTEAH, SR.,
CORRECTIONS CORPORATION OF AMERICA, CCA OF TENNESSEE, INC. AND
UNKNOWN PERSONS 1 THROUGH 100,

        Defendants.

### <u>MEMORANDUM OPINION</u>

       This matter comes before the Court for consideration of Defendants Thomas and

Panteah's Motion for Certification ("Motion to Certify") that they were acting within the course

and scope of their employment at the time of the alleged incident which is the basis of the

Complaint in this action. The United States (USA) refused to so certify, denying them coverage

under the Federal Tort Claims Act (FTCA).  This court has jurisdiction to review the USA's

denial of certification under 28 U.S.C. § 2679(d)(3).  <u>Gutierrez de Martinez v. Lamagno</u>, 515

U.S. 417, 437 (1995). The Court has reviewed the submissions of the parties and the relevant law,

and, for the reasons set forth below, finds that Defendants' Motion should be GRANTED.

1

## I.  BACKGROUND

Since 1986, the Ramah Navajo Chapter (RNC) has operated a Department of Public Safety (the "Department") under the Indian Self-Determination and Education Act, 25 U.S.C. § 450f et. seq., also known as Pub. L. 93-638, or ISDEAA. (See Dfdt. Ex. A, 1986 ISDEAA Contract.) The Bureau of Indian Affairs (BIA) funds the Department to perform certain functions, inter alia, "24-hour professional law enforcement and detention services to the Ramah Navajo Reservation" including "investigations of all offenses and violations of Navajo Nation Laws, Federal and State Law within the exterior boundaries of the Ramah Navaho reservation." (Dfdt. Ex. E, 2003 Annual Funding Agreement at 2.) Virtually all of the RNC law enforcement program is funded through ISDEAA.

Other than the Ramah tribal police, law enforcement in the area is provided primarily by the Cibola County Sheriff, whose office is located in Grants, New Mexico, about 65 miles away from the heart of the Ramah Navajo Community.  The response time for the sheriff is generally at least thirty minutes.

Defendant Thomas is a Ramah Navajo tribal police officer. This case arose on February 6, 2003 when he stopped Plaintiff's vehicle for speeding on New Mexico State Hwy 53. Defendant Thomas began writing Plaintiff a state citation but when he asked Plaintiff for his social security number Plaintiff refused to provide it and was arrested.

Defendant Thomas transported Plaintiff to the Ramah Navajo Police Station.  Defendant Panteah, Thomas's supervisor, contacted the State Police who advised him that no state officers to whom Plaintiff could be transferred were available.  Defendants Panteah and Thomas also contacted the Cibola County Sheriff's office, who advised they had no one available to transport

2

Plaintiff to Grants.  Defendant Thomas transported Plaintiff to the Cibola County Correctional

Center.

The Ramah Public Safety Department hired Defendant Thomas as a tribal police officer on

September 11, 2001. He received a commission as a deputy sheriff of Cibola County on August

13, 2002 and held that commission on the date of this incident.  His job description requires that

he enforce federal, state, local, and tribal laws and respond to "all...criminal situations"

encountered within the Ramah Navajo Community.  (Dfdt. Ex. J,[1] Ramah Navajo Position

Description.)   He was on his regularly scheduled shift when he arrested Plaintiff.

Defendant Panteah, Thomas's supervisor, is also employed by the Ramah Public Safety

Department. He was cross-commissioned with the Cibola County Sheriff's office and as a New

Mexico State Peace Officer. His Position Description does not expressly require him to enforce

state laws but it does require him to supervise patrol officers such as Thomas.

The area in which Defendant Thomas stopped Plaintiff is known as a jurisdictional

"checkerboard."[2] Defendant Thomas was within the area that he recognized as the Ramah Navajo

Reservation but he did not know whether it was actually Indian owned land. Officer Thomas later

determined that the speeding occurred on Indian Allotment land and the eventual stop occurred

on private fee land. Plaintiff is not an Indian.

---

[1]This Exhibit is marked Exhibit J but was admitted at the Evidentiary Hearing as Exhibit H.  For convenience, the Court will refer to it as Exhibit J.

[2]The word "checkerboard" comes from the fact that ownership of land alternates among Indian, non-Indian, federal, and state ownership. While these squares are not always exactly one mile, the area where this incident occurred on Highway 53 is generally in one mile sections. (Dfdt. Ex. G, Ramah Band of the Navajo Tribe of Indians Map.)

There is a factual dispute whether Ramah constitutes an "Indian reservation."  BIA Realty Specialist Sando testified that it is not, because a reservation has never been legally created through Congressional act or Executive Order.  In referring to a map of the Ramah Navajo Community (Dfdt. Ex. G), Mr. Sando stated that the black line drawn around the perimeter is drawn for convenience, does not identify a reservation, and merely identifies the Ramah Navajo Community. He further testified that State Highway 53 cuts through this Indian community.

In contrast, a Ramah community leader who assisted in creating the map that was admitted into evidence here, testified that she worked with BIA to make the map and that the line drawn around the map represented the "Ramah reservation."  Moreover, in the Ramah ISDEAA contracts and annual funding agreements signed by the BIA, RNC is required to provide law enforcement services to the "Ramah Navajo Reservation."  (Dfdt. Ex. E.)[3]  Similarly, an agreement between the New Mexico State Police and RNC also refers to this area as the Ramah reservation.  (Dfdt. Ex. G1.)[4]

## II. PROCEDURAL HISTORY

On November 17, 2003, Plaintiff filed a complaint in state court alleging negligent and intentional torts and violations of his civil rights. In addition to Defendants Thomas and Panteah, Plaintiff named as Defendants Corrections Corporation of America and CCA of Tennessee Inc. (the "CCA Defendants"), the Board of Commissioners of Cibola County, the State of New Mexico, and other as yet unnamed defendants.

---

[3]See also e.g., Dfdt. Ex. A, 1986 ISDEAA Contract § 201 (identifying the scope of work as providing security on the Ramah Navajo Reservation); Dfdt. Ex. C, 2000 Annual Funding Agreement at 2 (providing that law enforcement and real estate services are provided to the Ramah Navajo Reservation).

[4]This Exhibit is marked "G" but was admitted as G1 to distinguish it from the map which was admitted as Exhibit G.

4

The CCA Defendants removed the case to federal district court on December 16, 2003. Neither the County nor the State consented to that removal.[5] The parties agreed to an order remanding the case to state court on June 15, 2004.

On July 21, 2004, Defendants Thomas and Panteah moved the state court to certify them as federal employees acting within the scope of their employment. Upon receiving notice of that motion, the USA (which was not yet a defendant) removed the case to federal district court pursuant to 28 U.S.C. § 2679(d)(3) on August 19, 2004. In response, Plaintiff moved to remand the case back to state court. On November 4 and 5, 2004, the Court held an evidentiary hearing. See Stokes v. Cross, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (explaining the need for an evidentiary hearing for certification of scope of employment).

### III. STANDARD OF REVIEW

The USA denied certification to Defendants that they were acting as federal employees within the scope of their employment under the RNC ISDEAA contract, thus denying them coverage under the Federal Tort Claims Act (FTCA). That denial is subject to de novo review. Richman v. Straley, 48 F.3d 1139, 1145 (10th Cir. 1995). A party seeking review of the Attorney General's denial of certification bears the burden of presenting evidence and disproving the Attorney General's decision by a preponderance of the evidence. Id.

---

[5]The State of New Mexico has reminded this Court of its Motion to Dismiss that it has filed and the State has asked that its motion be converted into a Motion for Summary Judgment and judgment entered in favor of the State of New Mexico. (Doc. 35, Dfdt. State of New Mexico's Memorandum Brief Regarding Defendant Cornelius Thomas's Authority to Arrest Plaintiff at 2.) The State's original Motion to Dismiss was filed in federal court in case number 03cv1434. That case was terminated when the parties agreed that it should be remanded back to state court, thus transferring the State's Motion to state court. When the USA removed the case to federal court, the only reference to the State's Motion was a docket sheet from the state court; a copy of the State's Motion was never provided to this Court. The US Attorney is hereby admonished that, in the future, copies of the state court records are required. However, because the non-FTCA claims are being remanded to state court, this Court will not decide the State's motion.

## IV. DISCUSSION

Tribal members are not federal employees because they operate under ISDEAA contracts. However, they may be deemed federal employees for the Federal Tort Claims Act. See ISDEAA, Pub. L. 101-512 § 314, 104 Stat. 915 (1990) (codified in 25 U.S.C. § 450f Note).

The FTCA grants exclusive jurisdiction to district courts for a claim against the United States for torts committed by federal employees while acting within the scope of employment. 28 U.S.C. § 1346(b)(1); Williams v. U.S., 350 U.S. 857 (1955). Generally, whether a particular defendant is covered under the FTCA requires a two part analysis. First, whether Defendant is a federal employee is based on federal law. Pattno v. U.S., 311 F.2d 604, 605 (10th Cir. 1962). Second, whether the employee was acting within the scope of his employment is analyzed under the law of respondeat superior of the state where the injury occurred. Williams, 350 U.S. at 857.

### The Authority of Federal Employees to Enforce State Law

As a threshold issue, the USA argues that Defendants Thomas and Panteah could not be deemed federal employees because neither federal law nor the ISDEAA contract authorize the enforcement of state law. Hence, a tribe who enters into an arrangement to have its employees enforce state law is acting, not under the ISDEAA contract, but rather in its capacity as a sovereign government.

The authority to enforce state laws generally belongs to the states, not to Congress. Brecht v. Abrahamson, 507 U.S. 619, 635 (1993) (noting that the States possess primary authority for defining and enforcing criminal law). The Tenth Amendment limits the powers of Congress to infringe on state powers. New York v. U.S., 505 U.S. 144, 156 (1992). However, the fact that Congress does not have power to compel the states to permit something does not

preclude state officials from doing it voluntarily.  Printz v. U.S., 521 U.S. 898, 936 (1997)
(O'Conner, J. concurrence) (noting that while Congress could not compel state law enforcement
officers to comply with the Brady Act, such officers may choose to voluntarily comply). Hence,
the proper question here, is not whether federal law directly authorizes federal agencies to enforce
state law but whether federal law allows them to enter into consensual arrangements to enforce
state law. The federal statute that authorizes law enforcement in Indian Country is the Indian Law
Enforcement Reform Act, 25 U.S.C. § 2801 et seq.  It does not expressly authorize federal
employees to enforce state law but it does permit them to "assist" with enforcement of State law
"when requested." 25 U.S.C. § 2803(8) (2000).

### ILERA Permits Assistance with Enforcement of State Law When Requested

The USA argues ILERA limits the Secretary to enforcing federal and tribal law only.  25
U.S.C. §§ 2802(c)(1) and 2803(2).  It arrives at this conclusion based on 25 U.S.C. § 2804(a).
However, that section is expressly one directional, it authorizes delegation of federal and tribal
law enforcement powers to other agencies but does not mention agreements to enforce state law.
To explain the language of § 2803(8) (authorizing assistance with state law when requested), BIA
law enforcement Officer Bowekaty testified that the meaning of "assist" and "when requested"
were limited within the law enforcement community to assisting a state officer on a case by case
basis. The USA urges this to argue that a "case by case" requirement must be read into § 2803(8),
otherwise § 2804(a) and its omission of agreements to enforce state law would be superfluous.
This argument misapprehends the purpose and language of ILERA.

*The Purpose of ILERA*

ILERA was passed to provide "*comprehensive* statutory authority for the Bureau of Indian Affairs to provide *law enforcement services* on Indian reservations and *in Indian country*." S. Rep. 101-167, at 5, *reprinted in* 1990 U.S.C.C.A.N. 712, 713 [emphasis added]. It was designed "to clarify and strengthen the authority of the law enforcement personnel and functions...." U.S. v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993) (quoting S. Rep. 101-167). The impetus behind ILERA was that BIA law enforcement lacked clear statutory authorization; it had been based merely on language in Interior appropriations providing, inter alia, "For maintaining law and order on Indian reservations." S. Rep. 101-167, at 5, *reprinted in* 1990 U.S.C.C.A.N. 712, 713. Congress was concerned that without more comprehensive authorization, BIA officers could someday be held personally liable for "unauthorized" law enforcement activities.[6] Id. To avoid that result, Congress included not just authority to enforce Federal and tribal law, but also, authority to "assist" in enforcing State law, "when requested." 25 U.S.C. § 2803(8).

*The Statutory Language*

In describing § 2803(8) in the legislative history, Congress did not indicate any special meaning of "assist" or "when requested"; instead, Congress merely described this provision as authorizing the Secretary to "assist other law enforcement agencies in carrying out their responsibilities." S. Rep. 101-167 at 10, *reprinted in* 1990 U.S.C.C.A.N. 712, 718.

---

[6]Presumably, under the USA's theory, BIA officers enforcing state law would be acting *ultra vires* and would be exposed to the precise kind of personal liability Congress passed ILERA to prevent.

8

The first place to start in interpreting this statutory language then is plain English. Watt v. Alaska, 451 U.S. 259, 265 (1981). A court generally assumes that legislative intent is accurately expressed by the ordinary meaning of terms.  American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982); St. Charles Inv. Co. v. Comm'r of Internal Revenue, 232 F.3d 773, 776 (10th Cir. 2000). It is well-established that "absent ambiguity or irrational result," the literal language of a statute controls. Edwards v. Valdez, 789 F.2d 1477, 1481 (10th Cir. 1986).

The common meaning of "assist" means "to give support or aid ... in some undertaking or effort" or "to perform some service for" the object of the assistance. Webster's Third New International Dictionary 132 (1993). The common meaning of "request" means "to ask to do something" or "express a wish or desire to do something." Id. at 1929. Cross-commissioning and agreements to enforce state law would thus seem to fit well-within the ordinary meaning of these words.

The USA, however, argues that a broad reading of "assist" and "when requested" in § 2803(8) would render § 2804 superfluous and that reading a "case by case" requirement into the statute is needed to avoid that result. This misreads both the function and language of § 2804. Congress titled this section "Assistance by other agencies."  Pub. L. 101-379 § 5, 104 Stat. 473 (codified at 25 U.S.C. § 2804) [emphasis added.]  Its apparent function is to authorize the Secretary to delegate federal and tribal law enforcement authority to those outside of the Department of Interior so that those agencies may assist with federal and tribal law enforcement.[7]

---

[7] Without such an express authorization to delegate to non-federal entities, such a delegation would be presumptively improper. U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004).

Given this purpose, it is not surprising that § 2804 is silent about the terms under which the

Secretary may accept authority delegated <u>from</u> others.

In contrast, § 2803(8) authorizes the Secretary to assist with the enforcement of the laws

of other jurisdictions "when requested."   The purposes of these two sections are separate and

distinct. Therefore, reading "assist" and "when requested" in § 2803(8) to have their ordinary

meaning and permitting cooperative law enforcement arrangements does not render § 2804

superfluous.

Only one court has previously analyzed this language, albeit in the context of a specific

call for aid from a state law enforcement agency, (i.e., the "case by case" assistance).  <u>U.S. v.</u>

<u>Ziegler</u>, 136 F.Supp.2d 981, 987 (D.S.D. 2001). The court's reasoning is nonetheless instructive.

The court summarized the language in § 2803(8) as merely requiring "some kind of 'request'"

made by a state/local agency. <u>Id.</u> The court specifically avoided a rigid interpretation of "when

requested" and "assist" because, "otherwise it would chill cooperation among...federal, state,

local and tribal agencies and strip rather than augment the authority needed by the BIA officers to

serve and protect the public." <u>Id.</u> at 988.

*Evidence of Historical Practice*

The USA's argument for a "case by case" requirement is also impeded by the historical

setting in which ILERA was adopted.  New Mexico authorized cooperative agreements as early

as 1953.  NMSA § 39-1-12 (1953); <u>see also</u>, 1957-58 Op. N.M. Att'y Gen. No. 57-83.  Eleven

years before Congress passed ILERA, the BIA entered into an agreement to enforce state law in

New Mexico.  <u>See</u> Agreement between the New Mexico State Police and Bureau of Indian

Affairs, June 19, 1979. In 1978, a Department of Justice opinion emphasized the importance of

cooperation between law enforcement jurisdictions. U.S. Dep't of Justice, <u>Federal Bureau of Investigation--Statutory Jurisdiction--Authority of Agents Concerning Non-Federal Offenses</u>, 2 U.S. Op. Off. Legal Counsel 47, 50 (1978).  Court opinions pre-dating 1990 also refer to the practice. <u>See</u>, <u>Walks on Top v. U.S.</u>, 372 F.2d 422, 423-24 (9th Cir. 1967) (BIA officer commissioned to enforce Idaho laws); <u>State v. Ryder</u>, 649 P.2d 756, 757 (N.M. App. 1982) (<u>aff'd</u> 648 P.2d 774 (N.M. 1982)) (BIA officer commissioned to enforce New Mexico law). Cross-commissioning was thus well-recognized when Congress passed ILERA and the USA has offered no explanation why Congress would have, without specific language, abolished this established practice in a statute expressly intended to provide "comprehensive" law enforcement authority. S. Rep. 101-167, at 5, *reprinted in* 1990 U.S.C.C.A.N. 712, 713. Indeed, ILERA expressly provides that it is in <u>addition</u> to any authority that existed prior to passage of ILERA and not in derogation of that authority.  25 U.S.C. § 2806(d).

The evidence also contradicts the USA's contention that the BIA discontinued cross-commissioning after 1990 as a result of ILERA. In January 2000, ten years *after* ILERA was passed, the BIA updated its Law Enforcement Handbook.  Every Indian Country law enforcement program, including the RNC ISDEAA Public Safety Department, is required to comply with that Handbook.  25 C.F.R. § 12.14.[8]  In Chapter 2 of the Handbook, after discussing why cooperation with state law enforcement is needed, the Handbook provides that "[t]o facilitate this cooperative action, *officers hold joint commissions* as deputy sheriffs or are certified as State peace officers *whenever possible*."  BIA, <u>Law Enforcement Handbook</u> Vol. 1, 2.2.2 (rev. Jan. 2000) (emphasis

---

[8]  The Ramah Navajo Chapter ISDEAA Contract expressly requires that C.F.R. Parts 11 and 12 are the Program Standards for its Law Enforcement Program.  (Dfdt. Ex. B, 1997 ISDEAA Contract at 2.)

added) [hereinafter Handbook].  Furthermore, in describing BIA employees who accept special

commissions as deputy sheriffs, the Handbook expressly provides that such employees will be

considered to be acting within the scope of their employment.  Id. at 2.5.2, number 5. At the

evidentiary hearing, the government's law enforcement expert, Mr. Bowekaty, testified that he

had no knowledge of BIA notification to its officers in the field that they would no longer be

covered by the provisions of the Federal Tort Claims Act when enforcing state law. When asked if

BIA officers were ever informed that they shouldn't be enforcing state law, Mr. Bowekaty

testified that they were not so informed. When an agency's interpretation of a statute conflicts

with its past practice, it is not entitled to deference. Watt v. Alaska, 451 U.S. 259, 273 (1981);

Bowen v. Georgetown University Hosp., 488 U.S. 204, 212 (1988).

Finally, because ILERA is a statute involving Native Americans, it should be construed

liberally to their benefit.  In this case, that rule of construction dictates that the Court find that

ILERA permits a law enforcement practice which is essential in areas such as the checkerboard.

Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1462 (10th Cir. 1997); Albuquerque Indian

Rights v. Lujan, 930 F.2d 49, 59 (D.C. Cir. 1991); Brief for the States of Washington, Arizona,

California, Colorado, Michigan, Montana, New Mexico, and Oregon as Amici Curiae Supporting

Petitioner at *7, United States v. Billy Jo Lara, 2003 WL 22766742 (stating that such

arrangements are "essential" to effective law enforcement). Thus, the Court concludes that 25

U.S.C. § 2803(8) permits, and practical considerations encourage, the Secretary to enter into

agreements to have federal or tribal employees commissioned to enforce state law "when

requested" by a state or local law enforcement official.

12

### Defendant Panteah Was "Requested" to Assist with Enforcement of State Law

Recognizing the effectiveness of cooperative law enforcement, New Mexico passed a statute authorizing the Director of the State Police to enter into agreements to have tribal and federal officers enforce state law.  NMSA § 29-1-11.  Both the BIA and the Ramah Navajo Chapter have entered into such agreements which provide, inter alia, "the New Mexico State Police...desire to effectuate such legislative authorization." (Agreement Between the New Mexico State Police and the Bureau of Indian Affairs, June 19, 1979; Agreement Between the New Mexico State Police and the Ramah Navajo Chapter, February 1, 1994.) Pursuant to the New Mexico-Ramah agreement, Defendant Panteah is commissioned both as a state peace officer and a Cibola County deputy sheriff.[9]  The Court finds that Defendant Panteah was "requested" to assist in the enforcement of state law by the New Mexico State Police and pursuant to the authority granted by ILERA § 2803(8) in supervising Defendant Thomas.

### Defendant Thomas Was "Requested" to Assist with Enforcement of State Law

Several parties have complained that Defendant Thomas was not properly authorized to enforce state law. While these arguments may be relevant to whether Plaintiff's arrest was lawful, the Court concludes that they are irrelevant to the question of whether Defendant Thomas was "requested" to assist with enforcement of state law for the purposes of ILERA. Defendant Thomas has not been commissioned as a state peace officer pursuant to the Agreement between RNC and the New Mexico State Police.  However, he has been commissioned as a deputy sheriff

---

[9]That agreement is expressly limited to the Ramah reservation and Defendant Panteah's conduct in this case occurred while he was at the Ramah Police Station. Although there is a dispute as to formal recognition of the Ramah reservation, the Court finds that there is a common understanding of this term between the State of New Mexico, the United States and the Ramah Navajo Chapter because their agreements reference that term. Furthermore, the Court found the testimony it received from Ms. Eagle and Defendant Thomas more persuasive and detailed on the subject of the Ramah reservation than the USA's expert Mr. Bowekaty.

of Cibola County.[10] Furthermore, the statutory language is not limited to "when authorized." In

other sections of ILERA, Congress required that a federal employee be "authorized" before

acting. 25 U.S.C. §§ 2803(2)(B) and 2803(5). When Congress chooses one word in a section of

a statute and uses a different word elsewhere in the same statute, it is assumed that Congress

intended a distinction. Russello v. U.S., 464 U.S. 16, 23 (1983). Here, Congress merely required

that enforcement of state law be "requested," not that it be "authorized." The Court finds that

Defendant Thomas's commission from the Cibola County sheriff was sufficient evidence that his

assistance was requested within the meaning of ILERA.[11]

**Whether Defendants Panteah and Thomas Should Be Deemed Federal Employees**

　　　　Although subject to exception, the federal courts have recognized tribal employees

performing official functions under an ISDEAA contract are generally treated as federal

---

[10]In New Mexico, sheriffs may appoint deputies and their law enforcement powers extend statewide. NMSA §§ 4-41-5, 9, 10, 12.

[11]Plaintiff has pointed to a recent New Mexico case, State v. Branham, 2004 WL 2892075 (N.M. App.), where the New Mexico Court of Appeals granted a motion to suppress because a state police officer had enforced Mescalero tribal law without a written Mutual Aid Agreement pursuant to NMSA § 29-8-3. The Branham court found that the officer was not authorized to enforce tribal law absent a written mutual aid agreement. This Court finds Branham distinguishable for several reasons. Most importantly, Branham is not helpful because it dealt with whether the officer was authorized rather than whether the officer was requested to assist pursuant to ILERA. Second, in Branham the court found that the state police officer was not commissioned to enforce Mescalero law; Branham at *2; in contrast, here Defendant Thomas was commissioned by the Cibola County sheriff. Third, Branham addressed whether the traffic stop was lawful and if not, whether the resulting evidence should be suppressed; here the question is civil tort liability. Finally, the Branham court concluded that ILERA's § 2804 required a written agreement before the Secretary could delegate authority to other agencies; the Branham court did not address the authority in § 2803(8). The language in § 2804 expressly refers to "agreements," fairly raising the question whether those agreements must be written. In contrast, § 2803(8) never uses the word "agreement."

employees.[12] The Eighth Circuit has emphasized the broad scope of federal authority granted to

tribal law enforcement officers operating contracts under ISDEAA:

> [In 1976], acting pursuant to [ISDEAA], BIA entered into a contract under which the Ogalala Sioux Tribe Public Safety Commission...agreed to provide the entire gamut of law Enforcement Services on the Reservation, including the arrest of violators of Tribal Penal Code provisions, Federal *and State* law. ...When a 638 contract meets the definition of a § 2804(a) agreement and when tribal officers designated under that contract enforce laws that BIA would otherwise enforce, § 2804(f) expressly provides that those officers are given the same protection...that Congress afforded BIA employees. This is so regardless of whether the officer is enforcing *tribal, federal or state law*, so long as he is engaged in the performance of his official duties rather than on a personal frolic of his own.

Schrader, 10 F.3d at 1350-1 [emphasis added] [internal quotes omitted.].

> The pertinent language in ISDEAA reinforces application of the general rule:

> With respect to claims resulting from the performance of functions... under a contract...authorized by the Indian Self-Determination Education and Assistance Act,...an Indian tribe...is deemed...to be part of the Bureau of Indian Affairs...while carrying out any such contract...and its employees are deemed employees of the Bureau...while acting within the scope of their employment in carrying out the contract...

Pub. L. 101-512 § 314.

> Here, there is no dispute that Ramah had a contract authorized by ISDEAA. The USA,

however, questions whether enforcing state law was a proper function under that contract. It does

admit that the RNC ISDEAA contract lacks a scope of work and that the tribe is authorized to

operate any program the Secretary would be authorized to operate. (Motion to Certify, Ex. D,

---

[12]Pourier v. U.S., 138 F.3d 1267, 1268 (8th Cir. 1998); Walker v. Chugachmiut, 46 Fed. Appx. 421, 423 (9th Cir. 2002) ("any" tort claim resulting from the carrying out of an ISDEAA contract would be covered by the FTCA provided that the employee was acting within the scope of employment); Big Crow v. Rattling Leaf, 296 F.Supp.2d 1067, 1070 (D.S.D. 2004) (an employee acting within the scope of his employment is covered by the FTCA, even if the employee was paid by a different self-determination contract than the one under which the claim arose); Trujillo v. U.S., 313 F.Supp.2d 1146, 1150 (D.N.M. 2003); Morsette v. U.S., 26 Ind. L. Rep. 3502, 3503 (W.D. Wa. 1999); Big Owl v. U.S., 961 F.Supp. 1304, 1308 (D.S.D. 1997); Val-U Const. Co. of South Dakota v. U.S., 905 F.Supp. 728, 733 (D.S.D. 1995).

Letter from Dori Richards, DOI Solicitor to Margaret Gross, Tort Liaison, Ramah Navajo

Chapter, May 20. 2003, n.1.) The Court has found that ILERA authorized the Secretary to assist

with the enforcement of State law through cooperative agreements and cross-commissioning; the

contract therefore authorizes the tribe to enforce state law.

The Ramah ISDEAA contract lists the "function" at issue here as the "Department of

Public Safety," rather than just enforcing federal and tribal law.  (U.S. Ex. 1, 2003 Annual

Funding Agreement at 1.) But the USA argues that in the description of this function, the contract

limits the tribe to investigations, not enforcement, of state law.[13] If "investigation" here were

intended as a limitation, the contract would deny the tribe's Public Safety Department any law

enforcement authority whatsoever--plainly an absurd result when it follows a sentence that

describes the Department as providing "law enforcement...services." (Dfdt. Ex. E).  Hester v. Int'l

Union of Operating Engineers, 941 F.2d 1574, 1583 (11th Cir. 1991) (contract should be

interpreted to avoid absurd result). Thus, the Court concludes that the contract's description is

intended to be (as the heading says), merely an illustrative "brief description" of activities

conducted under the contract, rather than a limitation on activities permitted. The Court further

concludes that the "function" at issue here is the Public Safety Department. (See Dfdt. Ex. E,

2003 Annual Funding Agreement at 2, "The...functions ...to be performed...are identified as

follows...Public Safety Department...")[14]

_____

[13]"Basic police services that are provided to the Ramah Navajo community are investigations of all offenses and violations of Navajo Nation Laws, Federal, and State Law..." (U.S. Ex. 1, 2003 Annual Funding Agreement at 2.)

[14]At the evidentiary hearing, counsel for the USA explained that because of jurisdictional difficulties, tribal officers should consult with the US Attorney before making an arrest.  The facts before the Court illustrate why this is unworkable.  At the time of the arrest, Defendant Thomas was in the checkerboard area and did not know whether he was on Indian or non-Indian land.  Thus, even if he had called the US Attorney's office prior to

Generally ambiguities in federal statutes have been interpreted liberally in favor of Indians, Ramah Navajo Chapter, 112 F.3d at 1461, and Congress has expressly required courts to interpret ISDEAA and associated contracts liberally to benefit Indian contractors. 25 U.S.C. § 450*l*(c)(Section 1 "Purpose").  In view of the purpose and language of ISDEAA, the Court concludes that enforcing state law was properly within the Public Safety Department function. Both Defendants Panteah and Thomas will be deemed federal employees pursuant to Pub. L. 101-512 § 314.[15]

## Were Defendants Acting within the Scope of Their Employment?

Having concluded that this claim has resulted from performance of functions under the ISDEAA contract and that Defendants should be deemed federal employees, the remaining issue is whether Defendants were acting within the scope of their employment.  In this case, New Mexico law provides the definition and interpretation of "scope of employment."  Otteson v. U.S., 622 F.2d 516, 517 (10th Cir. 1980) (citing Rayonier, Inc. v. U.S., 352 U.S. 315, 319 (1957).)

---

arresting Plaintiff, Defendant Thomas would have been unable to provide the necessary information (land ownership) to make a determination of jurisdiction. Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 358 (1962) (noting that "law enforcement officers operating in [such an] area will find it necessary to search tract books in order to determine whether criminal jurisdiction...is in the State or Federal government.").

[15]The Court concedes that this interpretation potentially exposes the United States to substantial liability for the conduct of contractors over whom it has little control.  However, when Congress was considering whether to extend FTCA coverage to ISDEAA contractors, the BIA, the Indian Health Service (IHS) and the Department of Justice (DOJ) all argued against it for precisely this reason. S. Rep. 100-274, *reprinted in* 1988 U.S.C.C.A.N. 2620, 2667 (BIA), 2677 (IHS) and 2678-79 (DOJ). While the Court appreciates the cogency of this argument, it is apparent that Congress has settled the policy question in favor of providing insurance coverage.

**Defendant Thomas's Personal Legal Problems**

In March 2002, Defendant Thomas's wife filed a domestic violence complaint against him and received a Protective Order. Defendant Thomas was ordered not to possess a firearm. Defendant Panteah placed him on administrative leave then assigned him to non-law enforcement duties.  Eventually a court concluded that no physical abuse had occurred and the court permitted Defendant Thomas to possess firearms while on duty.  In August 2002, Defendant Panteah returned him to his customary law enforcement duties.  In May 2003, the charges against Defendant Thomas were dropped.

The USA has argued that Defendant Thomas' legal troubles arising from his dispute with his wife would have rendered him unauthorized to carry out law enforcement activities under the Indian Child Protection and Family Violence Act.[16] 25 U.S.C. § 3201 et seq.  ("ICPFVA") Hence, he could not have been acting within his scope of employment.[17] Pursuing the same theme, the USA points to a New Mexico statute, NMSA § 4-41-8, contending that it would preclude Officer Thomas from serving as a deputy sheriff.[18]  Finally, Plaintiff argues that the lack of a state uniform precludes a finding that Defendant Thomas acted lawfully.[19]

---

[16]The facts do not seem to support the USA's argument because Officer Thomas was merely accused of a crime.  The regulations for ICPFVA plainly permit employers to continue to employ accused employees and do not require that they be removed from all law enforcement activities as the USA has argued. 25 C.F.R. § 63.20.

[17]Although the United States argument on this point extends for eight pages (Doc. 36, USA Memorandum of Law at 8-15), the USA does not cite to a single case for the proposition that scope of authority is the same as scope of employment.  Indeed, New Mexico law is to the contrary.

[18]Even if this statute applied, it is not self-executing.  It does not provide that a deputy is terminated from his employment if unqualified.  Instead, it says that a judge shall revoke a commission upon a substantiated complaint.  NMSA § 4-41-8.  No such complaint was filed here.

[19]It is not clear that New Mexico law requires a state uniform.  Even a windbreaker with the words "Albuquerque Police Department" would be sufficient if there are sufficient indicia to permit a reasonable person to believe that the person claiming to be a peace officer is who he claims to be.  State v. Archuleta, 879 P.2d 792,

These arguments misapprehend the test for scope of employment.  The fact that federal or state law would have prevented Officer Thomas from being authorized to serve as a law enforcement officer, even if true, would not answer the question whether he was acting within the scope of his employment.  Narney v. Daniels, 846 P.2d 347, 354 (N.M. App. 1992).

"[C]ourt decisions leave little doubt that a Government agent may act beyond his authority and still be within his scope of employment."  U.S. Dep't of Justice, Federal Bureau of Investigation--Statutory Jurisdiction--Authority of Agents Concerning Non-Federal Offenses, 2 U.S. Op. Off. Legal Counsel 47, 51 (1978) (citing Hatahley v. United States, 351 U.S. 173, 180-181 (1956)). An agent acting outside of his statutory authority will still be within his scope of employment if the acts have "more or less" connection to the duties committed to him by law. Hatahley, 351 U.S. at 180-81 (citing Spalding v. Viles, 161 U.S. 483, 498 (1896). Thus, the question before the court is not whether Defendants acted within their authority, but whether their actions had a connection to the duties committed to them by law.

The New Mexico rule is that an act is within the scope of employment if, (1) it was something fairly and naturally incidental to the employer's business assigned to the employee, and, (2) it was done while the employee was engaged in the employer's business with the view of furthering the employer's interest and did not arise entirely from some external, independent and personal motive on the part of the employee.  N.M.R.A. Civ. UJI 13-407.

When the nature of the work involves the use of force and the specific force is allegedly unauthorized, it may still be within the scope of employment if, (1) it is the kind of activity the

---

794-95 (Ct. App. 1992).  Here, Defendant Thomas was in full tribal uniform with a marked police car.  To accept Plaintiff's argument would persuade drivers that they need not comply with a tribal law enforcement officer's instructions.

employee is employed to perform, (2) it occurs during a period reasonably connected to the authorized employment period, (3) it occurs in an area reasonably close to the authorized area, and (4) it is actuated, at least in part, by a desire to serve the employer.  Narney, 846 P.2d at 354-55. Under this test, even an off duty New Mexico officer outside of his jurisdiction may be within his scope of employment. Id. at 354.

### *Defendant Panteah*

Defendant Panteah was acting in his supervisory role when he received notice that Defendant Thomas had stopped a non-Navajo. Following his standard practice, he attempted to contact the State Police and County Sheriff. He instructed his subordinate, Defendant Thomas, to take Plaintiff to Grants. All these actions were fairly and naturally incidental to the RNC business assigned to him and they were done to further RNC's interests rather than for a personal motive of Panteah's.  N.M.R.A. Civ. UJI 13-407. His actions also took place at the Ramah Police Station at a time he was supposed to be there. Narney, 846 P.2d at 355. While an argument could be made that Defendant Panteah may have committed the tort of negligent supervision in returning Defendant Thomas to his role as a law enforcement officer with the domestic suit pending, that does not preclude a finding he was acting within the scope of his employment. Ortiz v. New Mexico State Police, 814 P.2d 117, 120 (N.M. App. 1991) (holding that supervisors could be held liable for negligent supervision). Defendant Panteah was acting within the scope of his employment.

### *Defendant Thomas*

As discussed, enforcing state law was in Defendant Thomas' position description.  During the activity at issue here, Defendant Thomas apprehended, arrested and detained Plaintiff for an

alleged state law violation. These activities are fairly and naturally incidental to his position as a police officer.  Furthermore, these activities were done to further RNC's interests and did not "arise entirely from some external, independent and personal motive on the part of the employee." N.M.R.A. Civ. UJI 13-407.

Although any alleged use of excessive force would presumably have been unauthorized, these acts were still within the scope of Defendant Thomas' employment.  Hatahley, 351 U.S. at 180-81.  It was the kind of activity he was employed for, at an appropriate place and time. Narney, 846 P.2d at 355. Defendant Thomas was acting within the scope of his employment.

Substitution of the United States for Defendants

The claims here resulted from the performance of the Public Safety Department function under RNC's authorized ISDEAA contract, and Defendants Thomas and Panteah were acting within the scope of their employment.  As such, they are deemed federal employees and are entitled to the full protection of the Federal Tort Claims Act. Pub. L. 101-512 § 314.  The United States will be substituted for Defendants Panteah and Thomas. 28 U.S.C. § 2679(d)(4).

The exclusive remedy against a federal employee acting within his scope of employment is the Federal Tort Claims Act (FTCA).  28 U.S.C. § 2679(b)(1).  The FTCA requires that a plaintiff exhaust his administrative remedies before bringing a claim against the United States. 28 U.S.C. § 2675(a).  Absent such exhaustion, this court has no jurisdiction to consider the FTCA claims.  Three-M Enterprises, Inc. v. U.S., 548 F.2d 293, 294 (10th Cir. 1977). The claims against the United States will be dismissed for failure to exhaust administrative remedies; however, the administrative claim may be filed within 60 days of this dismissal and still be deemed timely for the purposes of 28 U.S.C. § 2401(b).  28 U.S.C. § 2679(d)(5).

Plaintiff has argued that accepting Defendants' reasoning leaves Plaintiff without a remedy. Notwithstanding that possibility, the Supreme Court has held that when it applies, the FTCA is the exclusive remedy. U.S. v. Smith, 499 U.S. 160, 165 (1991). Dismissal of the claims against the United States still leaves the remaining non-federal defendants and the claims pertaining to them. Once the federal party is eliminated, it is proper to remand the case to state court when the merits have not yet been addressed if judicial economy will not be sacrificed by the remand. Dist. of Columbia v. Merit Systems Protection Bd., 762 F.2d 129, 133 (1985).

## V. CONCLUSION

Defendants Thomas and Panteah are deemed to be employees of the BIA and acting within the scope of their employment.  The United States will be substituted for Defendants Thomas and Panteah and the claims against the United States dismissed for failure to exhaust administrative remedies.  The remainder of the case will be remanded to state court.

**DATED** at Albuquerque this 27th day of January, 2005.

_____
BRUCE D. BLACK
United States District Judge

Attorneys:

For Plaintiff:
      William G. Stripp
      P.O. Box 159
      Ramah, N.M.  87321

For Defendants Thomas and Panteah:
      Sampson Martinez
      P.O. Box 2415
      Gallup, N.M. 87305

22

For the United States:
     John Zavitz
     Assistant U.S. Attorney
     P.O. Box 607
     Albuquerque, NM  87103

     Dori Richards
     U.S. Dep't of Interior
     SW Regional Solicitor's Office
     505 Marquette NW #1800
     Albuquerque, N.M. 87102

For Defendant Cibola County Board of Commissioners:
     Emma R. Brittain
     Montgomery & Andrews
     P.O. Box 2307
     Santa Fe, N.M. 87504-2307

     Sarah M. Singleton
     Montgomery & Andrews
     P.O. Box 2307
     Santa Fe, N.M. 87504-2307

For Defendant State of New Mexico:
     Ira Bolnick
     NM Legal Bureau, RMD
     P.O. Box 26110
     Santa Fe, N.M. 87502

For Defendant Corrections Corporation of America and CCA of Tennessee, Inc.
     Gail Gottlieb
     Sutin, Thayer & Brown
     P.O. Box 1945
     Albuquerque, N.M. 87103